UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIDETH BAUTISTA HERNANDEZ,
individually and as mother and natural
guardian of M.H., an infant,

                              Plaintiff,

          v.

UNITED STATES OF AMERICA,

                              Defendant.

No. 16-CV-2211 (KMK)

---

M.H., an infant, by his mother and natural
guardian, Elideth Bautista Hernandez,

                              Plaintiff,

          v.

UNITED STATES OF AMERICA,
JACQUILINE YVONNE TODD, WICO
CHU, ORANGE REGIONAL MEDICAL
CENTER,

                              Defendants.

No. 16-CV-3139 (KMK)

OPINION & ORDER

---

Appearances:

Denise A. Rubin, Esq.
Rubin Law, PLLC
New York, NY
*Counsel for Plaintiffs*

Keith D. Silverstein, Esq.
Keith D. Silverstein & Associates, P.C.
New York, NY
*Counsel for Plaintiffs*

Anthony J. Sun, Esq.
U.S. Attorney's Office SDNY
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Elideth Bautista Hernandez ("Ms. Hernandez"), individually and as mother and natural guardian of M.H., an infant and M.H., an infant by his mother and natural guardian, Ms. Hernandez (together, "Plaintiffs"), bring these consolidated Actions against the United States of America (the "Government"), Jacquiline Yvonne Todd ("Dr. Todd"), Wico Chu ("Dr. Chu"), and Orange Regional Medical Center ("ORMC," and collectively, "Defendants"), pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2401, 2671–80.  Plaintiffs assert claims for medical malpractice, failure to provide informed consent, and negligent hiring, screening, and training.  (*See* Compl. (Dkt. No. 41, 16-CV-2211 Dkt.); Notice of Removal Ex. A (Dkt. No. 1, 16-CV-3139 Dkt.).)[1]  Before the Court is the Government's Motion for Summary Judgment (the "Motion").  (*See* Dkt. No. 35.)[2]  For the reasons to follow, the Government's Motion is granted.

## I.  Background

### A.  Factual Background

Plaintiff Ms. Hernandez was a prenatal patient at Middletown Community Health Center, Inc. ("MCHC") in 2006, while she was pregnant with her first child, and again in 2007, while pregnant with M.H.  (*See* Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Gov't's 56.1") ¶¶ 11–12 (Dkt. No. 37); Pls.' Resp. to United States' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pls.' 56.1") ¶¶ 11–12 (Dkt. No. 45).)  On November 24, 2007, because she had not felt her baby move for two days, Ms. Hernandez went to MCHC

---

[1] In a letter dated March 6, 2017, Plaintiffs informed the Court that "a (corrected) Complaint filed [on March 4, 2017] on the 16-CV-2211 docket was just a replacement for document number 4, which was rejected for technical deficiency but apparently never re-filed." (Dkt. No. 42 (16-CV-2211 Dkt.).)

[2] Unless otherwise noted, all docket numbers refer to case number 16-CV-2211.

where she was examined and instructed to go to the hospital at ORMC. (*See* Gov't's 56.1 ¶ 13; Pls.' 56.1 ¶ 13.)[3] M.H. was born shortly after Ms. Hernandez arrived at ORMC. (*See* Gov't's 56.1 ¶ 14; Pls.' 56.1 ¶ 14.)[4] "M.H. was floppy, cyanotic, [and] unresponsive shortly after birth." (Gov't's 56.1 ¶ 15; Pls.' 56.1 ¶ 15 (internal quotation marks omitted).) Shortly after M.H. was born, Ms. Hernandez "was aware that M.H. was not breathing properly, and . . . required intubation" and that M.H. "had difficulty breathing due to a convulsion or seizure." (Gov't's 56.1 ¶¶ 16–17; Pls.' 56.1 ¶¶ 16–17.) Ms. Hernandez was told prior to her discharge from ORMC that M.H.'s seizures were caused by a lack of oxygen to his brain and that this loss of oxygen "was related to the fact that he did not move for one day while in the womb." (Gov't's 56.1 ¶ 19; Pls.' 56.1 ¶ 19 (internal quotation marks omitted).) Following M.H.'s birth, Ms. Hernandez was told by a neurologist that M.H. had encephalopathy. (*See* Gov't's 56.1 ¶ 20; Pls.' 56.1 ¶ 20.)[5] M.H. has been on phenobarbital to reduce his risk of convulsions and seizures since shortly after his birth. (*See* Gov't's 56.1 ¶ 21; Pls.' 56.1 ¶ 21.)

On January 23, 2008, M.H. was evaluated by Ages & Stages, LLP, Therapeutic and Educational Services, where staff performed both an Initial Multidisciplinary Developmental Assessment and a Supplemental Physical Therapy Evaluation. (*See* Gov't's 56.1 ¶ 22; Pls.' 56.1 ¶ 22.) The reports noted, among other findings, that "M.H. was born cyanotic, unresponsive and was not breathing for several minutes after birth," that "M.H. had moderate hypotonia

---

[3] Although Plaintiffs admit that Ms. Hernandez testified that she was seen by a nurse, they aver that "there is nothing in [Ms. Hernandez's] testimony to document that it was a nurse who examined her at MCHC on the day of M.H.'s birth." (Pls.' 56.1 ¶ 13.)

[4] The Parties dispute the accuracy of Ms. Hernandez's testimony on the timing of M.H.'s birth. (*See* Gov't's 56.1 ¶ 14; Pls.' 56.1 ¶ 14.)

[5] Encephalopathy is a disease of the brain, especially one that involves alterations of brain structure.

(floppiness) and . . . diffuse decreased attenuation due to hypoxic insult," and that M.H. was "at risk for developmental delay . . . and his pediatrician had concern with microcephaly for developmental delay." (Gov't's 56.1 ¶ 23; Pls.' 56.1 ¶ 23 (internal quotation marks omitted)). Ms. Hernandez participated in the assessments and a Spanish-language translator was present. (*See* Gov't's 56.1 ¶ 23; Pls.' 56.1 ¶ 23.) The results of the assessments were reviewed with M.H.'s family. (*See* Gov't's 56.1 ¶¶ 25, 27; Pls.' 56.1 ¶¶ 25, 27.)

On May 19, 2008, M.H. underwent a pediatric neurologic evaluation performed by Dr. Ronald I. Jacobson. (*See* Gov't's 56.1 ¶ 28; Pls.' 56.1 ¶ 28.) Dr. Jacobson's report found that M.H. was "born after an emergency caesarean section with decreased fetal activity and eventually determined to have hypoxic ischemic encephalopathy, secondary microcephaly, and neonatal seizures," along with "generalized [brain] atrophy and injury." (Gov't's 56.1 ¶ 29; Pls.' 56.1 ¶ 29 (alteration and internal quotation marks omitted).) Dr. Jacobson noted that there was "no . . . family history of similar problems or seizures," and reviewed all of his findings with Ms. Hernandez and her husband. (Gov't's 56.1 ¶¶ 29–30; Pls.' 56.1 ¶¶ 29–30 (alteration and internal quotation marks omitted).)

Ms. Hernandez testified that when M.H. was approximately one year old, her husband told her that M.H.'s condition may have been caused by doctors who "did not tell M.H.'s parents the problem that M.H. had" and "did not tend to . . . M.H.'s parents at the clinic before M.H. was born." (Gov't's 56.1 ¶¶ 31–32; Pls.' 56.1 ¶¶ 31–32 (alterations and internal quotation marks omitted).) Ms. Hernandez's sister expressed similar "concern that M.H.'s conditions may have been caused by doctors or nurses," and suggested that Ms. Hernandez contact an attorney. (Gov't's 56.1 ¶¶ 33–34; Pls.' 56.1 ¶¶ 33–34.) Ms. Hernandez testified that she chose not to contact an attorney at that time because "she thought that it was God's will[] that the child's

condition was [M.H.'s parents'] lot in life."  (Gov't's 56.1 ¶ 36; Pls.' 56.1 ¶ 36 (internal quotation marks omitted).)

In April 2010, Ms. Hernandez told early intervention providers during a Bilingual Occupational Therapy Evaluation that "M.H. was the product of a normal pregnancy up until [eight] months gestation when complications arose."  (Gov't's 56.1 ¶ 37; Pls.' 56.1 ¶ 37 (internal quotation marks omitted).)  Ms. Hernandez explained that "[s]he was not feeling the baby moving and they discovered that he was not receiving oxygen to his brain and he was delivered via caesar[e]an section."  (Gov't's 56.1 ¶ 37; Pls.' 56.1 ¶ 37 (internal quotation marks omitted).)  The evaluation noted that "M.H. . . . demonstrate[d] significant delays in all areas including fine motor, sensory processing, and self[-]management abilities," and that "M.H. suffered post-natal seizures and there were abnormal findings on a CT scan and MRI," and that M.H. "has a diagnosis of seizures, microcephaly, hypoxic-ischemic encephalopathy and global development delays."  (Gov't's 56.1 ¶¶ 38–39; Pls.' 56.1 ¶¶ 38–39 (internal quotation marks omitted).)  The results of the evaluation were shared with Ms. Hernandez.  (*See* Gov't's 56.1 ¶ 38; Pls.' 56.1 ¶ 38.)

A second evaluation conducted one week later on May 3, 2010, noted that "M.H. was reportedly born cyanotic, unresponsive, and not breathing for several minutes[,] . . . had to be resuscitated and . . . intubated in the operating room due to poor respiratory effort."  (Gov't's 56.1 ¶ 40; Pls.' 56.1 ¶ 40 (internal quotation marks omitted).)  Additionally, M.H.'s "language skills were rated 2+ standard deviations below the mean for his chronological age."  (Gov't's 56.1 ¶ 41; Pls.' 56.1 ¶ 41 (internal quotation marks omitted).)  Ms. Hernandez reported in May 2010 that she began to worry about M.H. "at birth" and that he has received "physical therapy,

speech therapy, and occupational therapy" since he was an infant.  (Gov't's 56.1 ¶¶ 42–43; Pls.'
56.1 ¶¶ 42–43 (alteration and internal quotation marks omitted).)

In 2011, a social worker suggested to Ms. Hernandez that she contact an attorney in
connection with M.H.'s condition.  (*See* Gov't's 56.1 ¶ 44; Pls.' 56.1 ¶ 44.)  On July 18, 2012,
Ms. Hernandez signed a retainer agreement with Silverstein & Stern, LLP because "she did not
see progress in her child's condition."  (Gov't's 56.1 ¶¶ 45–46; Pls.' 56.1 ¶¶ 45–46 (alteration
and internal quotation marks omitted).)

B.  Procedural History

On May 19, 2015, Ms. Hernandez filed a complaint in the Supreme Court of the State of
New York, Orange County, on behalf of her infant son, M.H., against Nurse Pamela Peterson
("Nurse Peterson"), MCHC, Dr. Christopher Allen ("Dr. Allen"), Nurse Fran Ralson ("Nurse
Ralson"), Dr. Lynne DiCostanzo ("Dr. DiCostanzo"), Dr. Todd, Dr. Chu, and ORMC.  (*See*
Gov't's 56.1 ¶ 1; Pls.' 56.1 ¶ 1.)

On March 28, 2016, Plaintiffs Ms. Hernandez and M.H. filed an action in federal court,
assigned docket number 16-CV-2211, against MCHC, Nurse Peterson, Dr. Allen, Nurse Ralson,
and Dr. DiCostanzo (the "FTCA Action").  On April 27, 2016, Ms. Hernandez's state-court
action was removed to this Court and assigned docket number 16-CV-3139 (the "Removed
Action").  (*See* Notice of Removal (Dkt. No. 1, 16-CV-3139 Dkt.).)  On May 10, 2016, the
Actions were consolidated pursuant to a memo endorsement from the Court.  (*See* Dkt. No. 9.)

Pursuant to an Order issued May 25, 2016, the Parties engaged in limited discovery on
the issue of equitable tolling.  (*See* Dkt. Nos. 20, 28.)  On May 26, 2016, the United States was
substituted as Defendant in place of MCHC, Nurse Peterson, Dr. Allen, Nurse Ralson, and Dr.
DiCostanzo in both Actions, pursuant to the FTCA.  (*See* Dkt. No. 23.)

The Government filed the instant Motion for Summary Judgment and accompanying papers on January 27, 2017. (*See* Dkt. Nos. 35–38.) Plaintiffs filed their papers in opposition on March 6, 2017. (*See* Dkt. Nos. 42–47.) Included in Plaintiffs' submission was a letter motion requesting leave to file excess pages, (*see* Dkt. No. 42), as well as a notice of cross-motion by Plaintiffs for equitable tolling, (*see* Dkt. No. 43). The following day, the Government filed a letter seeking leave to strike Plaintiffs' cross-motion and 56.1 statement in support of the motion as contrary to the Court's December 7, 2016 Scheduling Order, unnecessary, and moot. (*See* Dkt. No. 48.) Plaintiffs filed a letter in response on the same day. (*See* Dkt. No. 49.) In a memo endorsement issued on March 8, 2017, the Court granted the Government's motion to strike and denied Plaintiffs' cross-motion. (*See* Dkt. No. 50.) The Government filed its reply papers in further support of the Motion on March 20, 2017. (*See* Dkt. Nos. 54–56.)

On March 25, 2017, Plaintiffs filed a letter seeking leave to file a sur-reply, (*see* Dkt. No. 57), and on March 27, 2017, the Government filed a letter in response, (*see* Dkt. No. 58). In a memo endorsement issued on March 27, 2017, the Court informed the Parties that Plaintiffs' letter would be considered by the Court as the sur-reply and that "[n]othing more [wa]s needed." (*See* Dkt. No. 59.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

B.  Analysis

The FTCA provides in relevant part that

> [a]n action shall not be instituted upon a claim against the United States for money damages for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.  The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C. § 2675(a).  A claim under the FTCA "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." *Id.* § 2401(b).  "Typically, FTCA medical malpractice claims accrue at the time of injury," *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 139 (2d Cir. 2011) (internal quotation marks omitted), yet, "where a plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies," *id.* at 139–40 (some internal quotation marks omitted).  This rule dictates that the accrual date is when, through reasonable diligence, the plaintiff "has or . . . should have discovered the critical

facts of both [the] injury and its cause." *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982); *see also A.Q.C.*, 656 F.3d at 140 (same).

However, "time limitations under the FTCA are nonjurisdictional and therefore subject to equitable tolling." *Palmer-Williams v. United States*, No. 14-CV-9260, 2016 WL 676465, at *3 (S.D.N.Y. Feb. 18, 2016) (citing *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1633 (2015)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Equitable tolling is "a drastic remedy applicable only in 'rare and exceptional circumstances.'" *A.Q.C.*, 656 F.3d at 144 (alteration omitted) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)).

Here, the Government contends that summary judgment is warranted because Plaintiffs' "claims accrued more than two years prior to Plaintiffs' state court lawsuit and Plaintiffs' administrative claim," and "Plaintiffs cannot establish that equitable tolling of the statute of limitations should apply." (Mem. of Law in Supp. of the United States of America's Mot. for Summ. J. ("Gov't Mem.") 9 (Dkt. No. 38).) The Government additionally contends that the Court lacks subject matter jurisdiction over certain of Plaintiffs' claims. (*See id.* at 20–22.)

### 1. Subject Matter Jurisdiction

The Court first addresses the Government's argument that the Court lacks subject matter jurisdiction over certain of Plaintiffs' claims. The Government asserts that because "the Removed Action was filed prior to Plaintiff[s'] submission of [the administrative claim]," Plaintiffs' "claims against the United States in the Removed Action are premature, and they should be dismissed for lack of subject matter jurisdiction." (*Id*. at 21.) The Government also argues that the Court lacks subject matter jurisdiction over Plaintiffs' claims for lack of informed

consent and negligent screening, hiring, and training because Plaintiffs failed to present such claims to the relevant federal agency before filing suit.  (*See id.* at 21–22.)  Plaintiffs do not respond to these arguments.

### a.  Claims in the Removed Action

The FTCA's requirement that a claimant exhaust all administrative remedies before filing a lawsuit in federal court, *see* 28 U.S.C. § 2675 ("An action shall not be instituted upon a claim against the United States . . . caused by the negligent or wrongful acts or omission of any employee of the Government . . . unless the claimant shall have first presented the claim to the appropriate Federal agency . . . ."), "extends to all suits, *including those begun in state court*," *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) (emphasis added).  The Federal Employees Liability Reform and Tort Compensation Act (the "Westfall Act"), 28 U.S.C. § 2679, "expressly provide[s] that while the administrative-exhaustion requirement . . . appl[ies] to all actions, even those removed from state court, plaintiffs [are] given an opportunity, after the removal to exhaust those remedies."  *Celestine*, 403 F.3d at 83 (emphasis omitted).  Accordingly, the Westfall Act provides that

> [w]henever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure first to present a claim pursuant to [§] 2675(a) of this title, such a claim shall be deemed to be timely presented under [§] 2401(b) of this title if . . . (A) the claim would have been timely had it been filed on the date the underlying civil action was commenced, and (B) the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action.

28 U.S.C. § 2679(d)(5).  As is clear from its language, under the Westfall Act, a federal claim will be considered timely "only if the claim would have been timely had it been brought in federal court on the same date that it was actually filed in state court."  *Celestine*, 403 F.3d at 84 (citing 28 U.S.C. § 2679(d)(5)).  "To the extent that federal-state disparities in statutes of limitations yield [different] results . . . , in FTCA suits brought originally in state court by

plaintiffs who were unaware that the named tortfeasor was acting as an agent of the United States, . . . equitable tolling [may be appropriate] . . . ." *Id.*

While the Removed Action has not been "dismissed for failure first to present a claim pursuant to [§] 2675(a)," 28 U.S.C. § 2679(d)(5), were the Court to take such action—and Plaintiffs to present their claims "to the appropriate Federal agency within 60 days after dismissal," *id.* § 2679(d)(5)(B),—the Court would then be faced with the question of whether "the claim would have been timely had it been filed on the date the underlying civil action was commenced," *id.* § 2679(d)(5)(A).

As noted above, pursuant to the FTCA, a claim "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." *Id.* § 2401(b). Thus, if the claims asserted in the Removed Action accrued more than two years prior to the May 19, 2015 filing of their state-court action, their claim would be untimely and precluded by the Westfall Act, regardless of whether Plaintiffs exhausted their claims post dismissal. As the Parties have thoroughly briefed the question of timeliness, the Court will address the issue of when Plaintiffs' claims accrued *infra*.

b.  Lack of Informed Consent & Negligent Screening, Hiring, & Training

The Government also asserts that "Plaintiffs' administrative claim [in the FTCA Action] alleged only a failure to 'timely send [Ms. Hernandez] to the hospital for delivery' and a failure 'to timely deliver M.H. by [caesarean section],'" and accordingly, Plaintiffs' claims for lack of informed consent and negligent screening, hiring, and training of employees have not been exhausted. (Gov't's Mem. 21–22 (alterations omitted).)

A plaintiff's administrative tort claim "must provide enough information to permit the agency to conduct an investigation and to estimate the claim's worth." *Romulus v. United States*,

160 F.3d 131, 132 (2d Cir. 1998) (citing *Keene Corp. v. United States*, 700 F.2d 836, 842 (2d Cir. 1983)). The administrative claim "need not meet formal pleading requirements as long as it is specific enough to serve the purposes underlying § 2675(a)—to ease court congestion and avoid unnecessary litigation while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States." *Yunkeung Lee v. U.S. Dept. of Army*, No. 11-CV-331, 2013 WL 4048329, at *4 (E.D.N.Y. Aug. 9, 2013) (internal quotation marks omitted). A claimant must provide "more than conclusory statements which afford the agency involved no reasonable opportunity to investigate," *Romulus*, 160 F.3d at 132, and compliance with § 2675(a) is "strictly construed," *Furman v. U.S. Postal Serv.*, 349 F. Supp. 2d 553, 557 (E.D.N.Y. 2004) (internal quotation marks omitted).

Here, Plaintiffs' administrative claim includes no factual allegations on which to premise a lack of informed consent claim, nor does it make mention of the screening, hiring, or training of MCHC employees. (*See* Decl. of Anthony J. Sun ("Sun Decl.") Ex. A (Dkt. No. 36).) Absent such information, the Government cannot "investigate, evaluate, and consider settlement of" these claims. *Johnson ex rel. Johnson v. United States*, 788 F.2d 845, 848 (2d Cir. 1986) (internal quotation marks omitted), *overruled on other grounds by Sheridan v. United States*, 487 U.S. 392 (1988). While these particular claims might involve the overall treatment of Ms. Hernandez during her pregnancy with M.H., they had to be specifically included to satisfy the exhaustion requirement. *See Hersko v. United States*, No. 13-CV-3255, 2015 WL 6437561, at *19 (S.D.N.Y. Oct. 20, 2015) (finding the plaintiff's claim for lack of informed consent was "barred as against the United States for failure to include it in his [administrative] claim form"); *Lassic v. United States*, No. 14-CV-9959, 2015 WL 5472946, at *4 (S.D.N.Y. Sept. 16, 2015) (finding that because the plaintiff's claim was "silent as to both the failure to warn and negligent

hiring claims . . . . , [the] plaintiff did not exhaust administrative remedies for those claims").

Accordingly, Plaintiffs' claims in the FTCA Action for lack of informed consent and negligent

screening, hiring, and training are dismissed for lack of subject matter jurisdiction.  The Court

thus turns to the timeliness of Plaintiffs' remaining claims.

### 2.  Accrual of Plaintiffs' Claims

Plaintiffs argue that the two-year statute of limitations under the FTCA should be

equitably tolled based on (1) Plaintiffs' lack of knowledge as to the underlying cause of M.H.'s

conditions and (2) MCHC's attempts to "sequester and withhold" documentation from Plaintiffs.

(*See generally* Pls.' Mem. of Law in Opp'n to the United States' Mot. for Summ. J. & in Supp.

of Their Cross Mot. for Equitable Tolling ("Pls.' Opp'n") (Dkt. No. 47).)  The Court addresses

each in turn.

Plaintiffs assert that equitable tolling applies to their claims because they still "have not

determined . . . whether [M.H.'s] injuries have an iatrogenic cause."  (*Id.* at 2.)  In particular,

Plaintiffs argue that

> [h]ere, [M.H.'s] parents still do not know the mechanism by which or the precise
> time their child was injured, much less by whom.  Plaintiffs do not currently know
> *the true cause* of M.H.'s physical injuries . . . . due to the fact that no medical
> provider explained the genesis of [M.H.'s] hypoxic insult.

(*Id.* at 21 (emphasis added).)  Plaintiffs also assert that "the case law requires that the plaintiff

have a basis for knowing that [the] underlying cause was the result of a medical intervention or

omission" in order to trigger the accrual of a claim.  (*Id.* at 1.)  However, Plaintiffs provide no

case law—and the Court is aware of none—that requires a plaintiff to *know* "the true cause" of

an infant plaintiff's injuries before a claim accrues.  (*Id.* at 21.)  Rather, the Second Circuit has

instructed that "a claim . . . accrue[s] when the plaintiff knows, or should know, enough 'to

protect h[er]self by seeking legal advice.'"  *A.Q.C.*, 656 F.3d at 140 (quoting *Kronisch v. United*

*States*, 150 F.3d 112, 121 (2d Cir. 1998)); *see also id.* at 139 n.2 ("[T]he claim did not accrue until the plaintiff knew enough about both the fact of her injury and its *potential iatrogenic cause* to protect herself by seeking legal advice." (internal quotation marks omitted)).

In *A.Q.C.*, the plaintiff, by her mother and natural guardian, brought a medical malpractice action against the mother's obstetrician pursuant to the FTCA. *See* 656 F.3d at 138. The defendant doctor regularly treated A.Q.C.'s mother at a prenatal clinic run by a federally-funded healthcare provider, however, A.Q.C.'s birth took place in February 2005 at Bronx-Lebanon Hospital Center, a private facility. *See id.* The plaintiff's pleadings alleged that "A.Q.C. was born with weakness in her left arm and left leg," and as a result, A.Q.C. was "referred to an early intervention counselor who monitored her ongoing care." *Id.* In December 2005, upon review of A.Q.C.'s medical records, the counselor "raised the possibility that A.Q.C.'s injury had been caused by medical malpractice" and told A.Q.C.'s mother that "she should consider looking into whether or not there was any medical malpractice relating to [A.Q.C.'s] birth." *Id.* (internal quotation marks omitted).

A.Q.C.'s mother contacted counsel in February 2006 and signed a retainer agreement in April 2006. *See id.* In December 2007, following multiple meetings with counsel, a decision was made to file suit, but it was not until February 2008 that the plaintiff's counsel inquired into the defendant's federal status. *See id.* A member of the plaintiff's legal team determined this "important fact almost by accident . . . . [when she] learned from a colleague that a doctor in an unrelated case had been deemed a federal employee." *Id.* Counsel then "placed a toll-free call to a government hotline . . . established for the very purpose of facilitating such inquiries and discovered that [the prenatal clinic] was covered by the FTCA" and then "presumed that [the defendant] might be deemed a federal employee." *Id.* at 138–39 (internal quotation marks

omitted).  On April 7, 2008, the plaintiff presented A.Q.C.'s claim to the Department of Health and Human Services.  *See id.* at 139.

The Second Circuit found that "[t]he 'critical facts' of A.Q.C.'s injury were readily discernible shortly after her February 1, 2005[] birth," as, in June 2005, the cause of the weakness in A.Q.C.'s extremities had been identified as Erb's palsy, and her mother "was well aware of that diagnosis, and it [wa]s that injury which form[ed] the basis of th[e] action."  *Id.* at 140.  Accordingly, the "claim related to that injury accrued once [the plaintiff] *had reason to suspect* that A.Q.C.'s injury was iatrogenic."  *Id.* (emphasis added).

"Instead of mechanically setting the date of accrual to coincide with the retention of counsel, the receipt of medical records, or any other event in the litigation process," the Second Circuit held that it must determine when A.Q.C.'s mother was "told of or *had reason to suspect* that the injury A.Q.C. suffered related in some way to the medical treatment she received."  *Id.* at 142 (emphasis added) (alterations and internal quotation marks omitted).  The Second Circuit found "[t]here [wa]s a strong argument that . . . [the] December 2005 conversation with the early intervention counselor provided [the plaintiff's mother] with the requisite reason to suspect," but that "the statute of limitations began to run *at least* as of the time [the plaintiff's mother] actually undertook to consult counsel about the possibility of a malpractice action."  *Id.* at 142–43.

Here, in their opposition to the Government's Motion, Plaintiffs repeatedly argue that no treating medical professional or therapist ever informed Ms. Hernandez of the cause of M.H.'s injuries.  (*See* Pls.' Opp'n 8 ("The treating physicians and therapists evaluating [M.H.] . . . have not told [Ms. Hernandez] that the infant's condition was caused by a doctor or nurse."); *id.* at 9 ("[Ms. Hernandez] *still has no understanding* of the cause of her son's catastrophic injuries."); *id.* at 11 ("[N]one of [M.H.'s] diagnoses provide the requisite knowledge of iatrogenic injury

required for the claim to accrue."); *id.* ("[N]othing in the report indicates an iatrogenic cause for the 'ischemic injury' described in the findings, and certainly there is no statement tying the infant's injuries and condition to a departure from good medical practice . . . .").) These arguments are misplaced. The proper inquiry is not when Ms. Hernandez *definitively knew* the cause of M.H.'s injuries, but when she "had reason to suspect that 'the injury [M.H.] suffered *related in some way* to the medical treatment [M.H.] received.'" *A.Q.C.*, 656 F.3d at 142 (quoting *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177, 180 (2d Cir. 2008)).

As in *A.Q.C.*, here, "the critical facts of [M.H.'s] injury were readily discernable shortly after [his] . . . birth" in November 2007. *Id.* at 140 (internal quotation marks omitted). M.H. underwent an Initial Multidisciplinary Developmental Assessment and Supplemental Physical Therapy Evaluation in January 2008, during which a Spanish-language interpreter was present and Ms. Hernandez "participated . . . and shared information that contributed to the evaluation findings." (Gov't's 56.1 ¶ 23; Pls.' 56.1 ¶ 23.) A "pediatric neurologic evaluation" was also conducted "[s]hortly after M.H.'s birth," during which "[a] neurologist told Ms. [Hernandez] that M.H. had encephalopathy." (Pls.' Opp'n 10.) A report from the neurologist was reviewed "in detail" with M.H.'s parents on May 19, 2008. (*Id.* at 11.)

Plaintiffs assert that "in the days after [M.H.'s] birth[,] . . . [Ms. Hernandez] did not discuss the infant's injuries with any doctor[s] or nurses," but that "her husband . . . spoke to her about the baby's condition . . . [and] told her that the child's condition was due to a lack of oxygen in his brain related to the fact that 'he did not move for one day' while in the womb." (*Id.* at 7.) "Approximately a year after [M.H.'s] birth, his father and his aunt urged [Ms. Hernandez] to seek counsel because no one at ORMC or Westchester Medical Center had told them how, when or why the infant suffered oxygen deprivation." (*Id.* at 8.) Indeed, "Mr.

Hernandez told Ms. [Hernandez] that he believed that M.H.'s conditions may have been caused by doctors or nurses." (*Id.*)  Plaintiffs emphasize that the reason behind Mr. Hernandez's suspicion that doctors and nurses were to blame was the fact that medical providers at ORMC or Westchester Medical Center—as opposed to MCHC—"did not tell M.H.'s parents the problem that M.H. had." (*Id.* (alteration and internal quotation marks omitted).)  Plaintiffs seem to suggest that the lack of *explanation* from providers was the source of Mr. Hernandez's concern and that this was insufficient to trigger claim accrual.  This argument is unpersuasive.

Plaintiffs offer no explanation as to why Ms. Hernandez failed to consult an attorney between the time M.H.'s father and aunt urged her to do so in 2008, and July 2012, when Plaintiffs first sought counsel.  Plaintiffs merely submit that despite that fact that "[t]he treating physicians and therapists evaluating the infant ha[d] communicated their examination findings and diagnoses," (*id.* at 8), "there can be no presumption that the review of the physician's findings indicated to the parents that a malpractice claim was or could be supported by his examination," (*id.* at 11).[6]

In *J.D. ex rel. Doe v. United States*, No. 11-CV-4296, 2011 WL 292010, at *1 (S.D.N.Y. Jan. 28, 2011), an infant-plaintiff, J.D., "was born . . . not breathing" and "suffered seizures following his birth."  In the months following J.D.'s birth, J.D. and his mother met with a pediatric neurologist, a physical therapist, a bilingual special educator, and a social worker, all of whom conducted evaluations and reported to J.D.'s parents that he "was showing signs of developmental delays."  *Id.* at *2–3, *7.  The court found that "J.D.'s parents knew within days of his birth that J.D.'s lack of oxygen at birth had caused brain damage" and "that as a result of

---

[6] The Court notes that this argument appears to put the onus on Plaintiffs' medical providers to alert Plaintiffs as to any potential malpractice claims.  Plaintiffs cite no law that recognizes such a burden.

that brain damage, he had experienced seizures and was at a risk for more seizures and delays in development." *Id.* at *8. Moreover, the court found that "[m]any of the circumstances surrounding J.D.'s birth should have, and did, alert [the] plaintiffs that his injury *might have been iatrogenic.*" *Id.* at *9 (emphasis added). For example, the mother "had experienced an uneventful pregnancy, yet at birth her son stopped breathing, was rushed to the hospital, and suffered seizures and brain damage." *Id.* J.D.'s family "discussed the circumstances of J.D.'s birth and *the possible cause* of J.D.'s injury in the presence of his parents" and "[h]aving such complaints and concerns about the quality of medical care . . . and its role in J.D.'s injury, his parents had a duty to investigate their claim." *Id.* (emphasis added),

In the instant Action, "the circumstances surrounding [M.H.'s] birth," coupled with discussions between Ms. Hernandez, her husband, and her sister "would have led a reasonable person to seek professional advice to help determine probable cause of her child's injury." *Id.* Ms. Hernandez's lack of "accurate understanding of the infant plaintiff's condition or the causes" or the fact that "her understanding" was not the result of "a physician or other medical personnel advising her of the facts she was stating at her deposition" is not dispositive. (Pls.' Opp'n 9 (internal quotation marks omitted).) "When it is not clear that an injury was doctor-caused ('iatrogenic'), a plaintiff's claim accrues once he has an obligation to seek information about whether the harm he suffered may relate to the medical treatment he received." *J.D.*, 2011 WL 292010, at *8. Here, it is clear from the record that Plaintiffs "had at least some reason to suspect that [M.H.'s] injury was related in some way to the treatment that []he had received" in 2008. *A.Q.C.*, 656 F.3d at 142.

Plaintiffs aver that "after a social worker suggested they consult an attorney in mid-to-late 2011, M.H.'s parents sought counsel." (Pls.' Opp'n 12; *see also id.* at 9 ("It was not until

2011 that a social worker seeing [M.H.] suggested to the mother that she should consult an attorney about his condition.").)  However, Plaintiffs fail to explain the delay from the time of the social worker's suggestion to the actual contact with counsel.[7]

Yet, even were the Court to find that Plaintiffs' claims did not accrue at the time M.H.'s father, aunt, and social worker each suggested Ms. Hernandez seek counsel, Plaintiffs' claims certainly accrued in July 2012 once Ms. Hernandez "kn[ew] enough to warrant consultation with counsel, and act[ed] with diligence . . . to undertake such consultation." *A.Q.C.*, 656 F.3d at 140. This retention of counsel demonstrates "sufficient knowledge of the possible iatrogenic cause of the injury to seek legal assistance." *Valdez*, 518 F.3d at 180.  Thus, Plaintiffs' administrative claim, filed nearly three years later in June 2015, was untimely.[8]

### 3.  Equitable Tolling

Even assuming Plaintiffs' claims had not accrued until Ms. Hernandez retained counsel in July 2012, Plaintiffs claims are timely only if the statute of limitations was tolled.[9]

---

[7] According to Plaintiffs' opposition, at the very least, Plaintiffs delayed contacting counsel for six months from "late 2011" until July 2012; however if the suggestion was made in "mid- . . . 2011," the delay may have been as long as a year.  (Pls.' Opp'n 11.)

[8] Plaintiffs' assertion that the court in *Valdez* "remanded for further inquiry about the plaintiff mother's diligence in seeking counsel *after she knew of the iatrogenic nature* of the infant's injuries within 14 months of his birth" is inaccurate.  (Pls.' Opp'n 21 (emphasis in original).)  The *Valdez* court found that "[14] months after the [infant plaintiff] was born, her mother had sufficient knowledge of the *possible* iatrogenic cause of the injury to seek legal counsel." 518 F.3d at 180 (emphasis added).  The Second Circuit's decision to remand was based on the fact that "the record was silent with respect to the circumstances that led [the plaintiff's mother] to seek legal assistance." *Id.*  Here, the question of whether Plaintiffs "had sufficient knowledge of the possible iatrogenic cause of the injury to seek legal counsel" is less relevant because the record is clear that Plaintiffs waited more than two years after retaining counsel to file suit.

[9] As noted *supra*, the Court denied Plaintiffs' cross-motion for equitable tolling.  (*See* Dkt. No. 50.)  However, the Court considers Plaintiffs' same arguments on equitable tolling in opposition to the Government's Motion.

Plaintiffs assert that "[g]iven the parents' very limited education and understanding, medical records in this matter were absolutely crucial to determining whether there was even a colorable claim to be made for malpractice." (Pls.' Opp'n 12.) As detailed above, while the medical records may have been critical to ascertaining the *cause* of M.H.'s injuries, they have no bearing on the time at which Plaintiffs "had reason to suspect that [M.H.]'s injury was iatrogenic." *A.Q.C.*, 656 F.3d at 140. Put differently, "'[the] plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim' for his claim to accrue." *J.D.*, 2011 WL 292010, at *8 (quoting *Kronisch*, 150 F.3d at 121). As the Second Circuit has explained, "medical malpractice claims brought under the FTCA can, and often will, accrue *before* a plaintiff actually retains counsel and before counsel requests, let alone receives, the relevant medical records." *A.Q.C.*, 656 F.3d at 141. Were knowledge of the actual *cause* of an injury—as indicated by medical records—required to trigger the accrual date, the statute of limitations could be tolled indefinitely, as often the cause of an injury is unknown. Indeed, pursuant to this argument, Plaintiffs' claims still have not accrued. (*See* Pls.' Opp'n 9 ("[Ms. Hernandez] *still has no understanding* of the cause of her son's catastrophic injuries."); *id.* at 21 ("Plaintiffs do not currently know the true cause of M.H.'s physical injuries . . . .").)[10]

---

[10] Additionally, there is no merit to the argument that Plaintiffs' claims could not have accrued before they retained counsel.

> That a medical malpractice claim will often accrue before counsel is retained makes perfect sense. An accrual date that turns on when a plaintiff (or his lawyers) finally decides to take action, rather than when the plaintiff was sufficiently alerted to the appropriateness of seeking legal advice, would render the limitations period meaningless. Under [such a] rule, a plaintiff sufficiently alerted who fails to seek counsel or who retains counsel too complacent to promptly research his claim would, by virtue of that inaction, be saved from the burden that Congress placed on FTCA plaintiffs in enacting 28 U.S.C. § 2401(b). Moreover, since [§] 2401(b) was designed in part to keep courts from having to deal with cases in which the search for truth may be seriously impaired by the passage of time, such a result would

Nor does Plaintiffs' characterization of Ms. Hernandez as "[a] [y]oung, [u]neducated [m]other [w]ho [s]peaks [n]o English," Mr. Hernandez as "a plumber," or M.H.'s aunt as "a babysitter," have a dispositive impact on the analysis. (*Id.* at 4.) Lack of legal knowledge, lack of education, or even intellectual disability are insufficient circumstances to justify equitable tolling. *See Wilson v. Bennett*, 188 F. Supp. 2d 347, 354 (S.D.N.Y. 2002) (holding that lack of legal knowledge and education are not sufficient and collecting cases); *see also Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) (denying equitable tolling for a plaintiff with mental disabilities where the plaintiff put forth a "conclusory and vague claim, without a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights"); *Chepilko v. Cigna Life Ins. Co. of N.Y.*, 952 F. Supp. 2d 629, 633 (S.D.N.Y. 2013) ("[T]he plaintiff's allegations regarding his disability are not specific enough to justify the extraordinary application of equitable tolling."), *aff'd*, 590 F. App'x 98 (2d Cir. 2015); *Santa v. United States*, No. 08-CV-3891, 2011 WL 4943552, at *5 (E.D.N.Y. Oct. 4, 2011) (finding the plaintiff's illiteracy and intellectual "deficiencies [we]re not sufficient to provide equitable tolling"). Furthermore, Plaintiffs had sufficient education and knowledge to retain counsel in 2012.

### 4. Proffer of MCHC's Records

Finally, the Court addresses Plaintiffs' contentions with respect to the time period during which they were represented in this case, beginning in July 2012.

---

undermine the statutory scheme by unduly and unpredictably lengthening the limitations period.

*A.Q.C.*, 656 F.3d at 141–42 (citation and internal quotation marks omitted).

Plaintiffs argue that "the more than two year delay in obtaining a full set of the prenatal care records from MCHC constituted . . . deception" and "created a delay in disclosure that would have allowed a timely F[TC]A [c]laim to be filed within two years of . . . [P]laintiffs' first consultation [with] the predecessor law firm . . . in July 2012." (Pls.' Opp'n 17, 22.)

First, Plaintiffs provide no indication that they were "pursuing [their] rights diligently," *Pace*, 544 U.S. at 418, during the period between July 2012, when Plaintiffs first sought counsel, and April 2013, when Plaintiffs' counsel first sought disclosure of Plaintiffs' medical records. Plaintiffs state that their former counsel was a partner in the "now-defunct law firm 'Silverstein & Stern'" and that at some point, "[P]laintiffs entered a new retainer with Keith D. Silverstein & Associates, P.C." (Pls.' Opp'n 12.) Plaintiffs offer no reason why the statute of limitations should be tolled during the nine months former counsel was retained but seemingly made no efforts to pursue Plaintiffs' case.[11]

Second, Plaintiffs' assertion assumes that they could not file a claim until their counsel was in receipt of medical records. As noted above, this argument is without merit. *See A.Q.C.*, 656 F.3d at 141 ("[M]edical malpractice claims brought under the FTCA can, and often will, accrue *before* a plaintiff actually retains counsel and before counsel requests, let alone receives, the relevant medical records."). Nor does the alleged "thwart[ing of] [P]laintiffs' counsel's attempts to obtain a full set of MCHC and ORMC medical records," (Pls.' Opp'n 2), have any

---

[11] While it is unclear whether Plaintiffs are asserting a claim of attorney error or negligence in connection with their prior counsel, the Court finds such an argument is unavailing. The Supreme Court has held "in the context of procedural default, . . . without qualification, that a [plaintiff] must bear the risk of attorney error." *Holland v. Florida*, 560 U.S. 631, 650 (2010) (internal quotation marks omitted).

bearing on counsel's ability (or lack thereof) to determine "that MCHC was a federal facility," (*id.* at 14).[12]

Plaintiffs assert that they "began to investigate" MCHC in August 2014, but at the time the administrative claim was served in June 2015, "[P]laintiffs and their attorneys did not know and could not have discovered through the exercise of reasonable diligence, that [during] the time period when prenatal care was rendered to . . . [Plaintiffs], [MCHC] was already a . . . Federal Public Health Service employee."  (*Id.* at 14–15; *see also id.* at 18 (asserting Plaintiffs had no "basis for knowing or suspecting that physicians, nurses, midwives[,] and other healthcare providers who treated [P]laintiffs at ORMC were Federal Public Heath Service employees[,] . . . [n]or could [P]laintiffs or their counsel discover this fact through the exercise of reasonable diligence").)  Plaintiffs submit that despite the lack of knowledge of or ability to discover MCHC's federal status, "[P]laintiffs' counsel determined in June 2015 that it was prudent to file the [administrative claim] naming MCHC and the providers named therein who were known to have treated [P]laintiffs at MCHC, because the possibility existed that in 2007[,] . . . [MCHC] had already been a . . . Federal Public Health Service employee."  (*Id.* at 15 (emphasis omitted).)  Plaintiffs offer no reason that this "determin[ation]" came to light nearly a year after their "investigat[ion]" of MCHC began.  (*Id.* at 14.)  *See A.Q.C.*, 656 F.3d at 145–46 ("[The plaintiff] points to no previously undisclosed fact that triggered the [f]irm's eventual inquiry; it appears that it simply finally occurred to a . . . lawyer, based on the same facts that had

---

[12] The Court is unpersuaded by the statement that a disclosure transmitted on August 14, 2014 was the "first time [Plaintiffs' counsel] knew that prenatal care had been rendered at MCHC." (*Id.*)  The notion that counsel presumably with expertise in personal injury law had been retained for over two years and had not diligently sought information about the facilities at which Ms. Hernandez received care in connection with the pregnancy and birth of M.H. is implausible.

been available essentially from the day [the plaintiff's mother] first approached the [firm], to make the inquiry.")  Indeed, in the Federal Action Complaint, Plaintiffs state that "[a]s soon as [c]ounsel investigated [MCHC's] administration and organization"—which by Plaintiffs' own account was in August 2014—"it was immediately clear from a posting on their website that the F[TC]A applied."  (Compl. ¶ 117.)  Plaintiffs still waited approximately 10 months to file their administrative claim.

"It is fundamental that a lawyer investigating a possible claim on behalf of a client . . . investigate not only whether a potential claim exists in the abstract, but also who would be the appropriate parties to sue, and what, if any, restrictions on the time and forum for bringing such a claim might exist."  *A.Q.C.*, 656 F.3d at 145.  As in *A.Q.C.* and *J.D.*, here, "no extraordinary obstacle prevented [Plaintiffs' counsel] from identifying [Defendants'] federal status," and this includes any alleged discovery failures.  *Id.*; *see also J.D.*, 2011 WL 292010, at *11 ("[T]he list of federally-funded health centers . . . appears on the Health Resources and Services Administration website.")  "To determine that status, all [counsel] had to do was either call a government-sponsored toll-free number or . . . [consult] the online database maintained by the Health Resources and Services Administration . . . ."  *A.Q.C.*, 656 F.3d at 145; *see also Lassic*, 2015 WL 5472946, at *3 ("[The] [p]laintiff urges that her delay should be excused because she did not know that [the facility] was a federal facility.  This lack of knowledge does not, however, excuse the delay as a matter of law."); *J.D.*, 2011 WL 292010, at *10 ("The statute of limitations is not tolled simply because a plaintiff is unaware that an alleged tortfeasor is a federal employee." (internal quotation marks omitted)); *id.* (noting the plaintiffs' lack of awareness about the defendant's federal status was "undermined by the readily available information on this subject," principally that "the list of federally-funded health centers . . . appears on the Health

Resources and Services Administration website"). Indeed, Plaintiffs' counsel admits that there was "notice to members of the public, and to [P]laintiffs' counsel" of MCHC's federal status pursuant to a "notation at the very bottom of the MCHC website," albeit a "tiny" one "in markedly smaller font than the remainder of the web page." (Pls.' Opp'n 14.)[13] As noted, at the time they filed their Complaint, Plaintiffs admitted that "[a]s soon as [c]ounsel investigated [MCHC's] administration and organization, . . . it was immediately clear from a posting on their website that the F[TC]A applied." (Compl. ¶ 117.) Plaintiffs raised no objections to the size of the website typeface at that time.

In short, Plaintiffs' claims under the FTCA are time-barred. Those claims accrued at the earliest in 2008 when Ms. Hernandez's family alerted her to the possibility that M.H.'s condition "may have been caused by doctors or nurses," (Pls.' Opp'n 8), at least in 2011 when "a social worker suggested [M.H.'s parents] consult an attorney, (*id.* at 12), and certainly in July 2012 when Ms. Hernandez signed a retainer agreement with former counsel because "she did not see progress in her child's condition," (Gov't's 56.1 ¶¶ 45–46; Pls.' 56.1 ¶¶ 45–46 (alteration and internal quotation marks omitted)).

Even were Plaintiffs to now file an administrative claim for the Removed Action pursuant to the Westfall Act, and the Court to apply the more forgiving New York State statute of limitations, *see Celestine*, 403 F.3d at 84 ("[F]ederal-state disparities in statutes of limitations [may] yield [different] results . . . ."), for medical malpractice, lack of informed consent, and

---

[13] Furthermore, the Court finds it unlikely that Plaintiffs' case was the first time counsel had encountered the challenge of discerning the federal status of a defendant, let alone one in connection with the type of injury at issue in this Action. The website for Keith D. Silverstein & Assoc., P.C. advertises "birth injury" as one of counsel's practice areas. *See Birth Injury*, Keith D. Silverstein & Assoc., P.C., http://www.kdslawfirm.com/Personal-Injury/Birth-Injury.shtml (last visited August 2, 2017).

negligence, those applicable statutes of limitation would still bar Plaintiffs claims.[14]  Considering

an accrual date of mid to late 2011, Plaintiffs' "underlying civil action was commenced" on May

19, 2015, well over three years after the limitations periods began to run. As noted above,

Plaintiffs are not entitled to equitable tolling and therefore, the Government's Motion for

Summary Judgment is granted.

The tragedy of this Action is not lost on the Court. "Judges and lawyers, like other

humans, are moved by natural sympathy in a case like this," *DeShaney v. Winnebago Cty. Dep't*

*of Soc. Servs.*, 489 U.S. 189, 202 (1989), but the Court is not free to ignore the law to account for

the emotional nature of this Action.

### III. Conclusion

For the forgoing reasons, the Government's Motion for Summary Judgment is granted.

The Clerk of Court is respectfully requested to terminate the pending Motions, (*see* Dkt. Nos. 35,

42 (16-CV-2211 Dkt.); Dkt. No. 47 (16-CV-3139 Dkt.)), and close these cases.

SO ORDERED.

DATED:  August **3**, 2017
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[14] In the instant case, there is a "federal-state disparit[y] in statutes of limitations" for the claims asserted in the Removed Action. *Celestine*, 403 F.3d at 84. To satisfy the New York statute of limitations, a medical malpractice action "must be commenced within two years and six months of the act, omission or failure complained of." N.Y. C.P.L.R. § 214–a. "New York applies a three-year statute of limitations to all negligence claims, including claims for negligent hiring and negligent supervision." *Universitas Educ., LLC v. Bank*, No. 15-CV-5643, 2015 WL 9304551, at *3 (S.D.N.Y. Dec. 21, 2015), *reconsideration denied*, 2016 WL 80210 (S.D.N.Y. Jan. 5, 2016). "The statute of limitations for lack of informed consent is . . . two and a half years." *Gibbons v. Fronton*, 661 F. Supp. 2d 429, 432 (S.D.N.Y. 2009).

27